CASE 94—PETITION FOR MANDAMUS—JANUARY 24.

# Houston, County Judge, &c., v. Steele.

### APPEAL FROM BOYD CIRCUIT COURT.

1. ELECTIONS—DUTIES OF CANVASSING BOARD.—Although the duties of the County Canvassing Board of Elections are purely ministerial, it is the duty of that board to canvass as a part of the returns the doubtful or questioned ballots returned by the precinct officers, and to count them for the one candidate or the other, or reject them altogether, as may appear to be proper from an inspection of the ballots.

2. SAME—MANDAMUS.—This duty of the canvassing board is controllable by mandamus, the court having the power to require a re-canvass, and to direct for what candidate, if for any, each doubtful or questioned ballot shall be counted.

3. VALIDITY OF BALLOTS.—Ballots marked with a cross made with pencil or ink of any color are to be counted provided they are in other respects regular, the provision of the statute that all marking upon the ballot shall be made with black ink stencil being directory merely.

4. SAME.—Ballots marked with a cross at the head of a particular party column, although outside the square containing the party device, are to be counted for the candidates of that party.

5. SAME.—A ballot having the cross under the Democratic device and also immediately across the top of the square to the right of the name of a candidate in the Republican column should be counted for that candidate.

6. SAME.—A ballot marked with a solid irregular black figure instead of a cross should be counted, the marking appearing to have been done with a stencil by twisting or turning it in the voter's hand, as the intention of the voter is manifest.

7. SAME.—A ballot marked with a cross in the square to the right of the name of a Republican presidential elector at the head of the Republican column, and marked nowhere else, should be counted for that candidate alone, although probably intended for the entire Republican ticket.

8. SAME.—Ballots marked with two or more crosses in one square, or with a cross of a peculiar form, should be counted if otherwise regular, as these are not such "distinguishing marks" as invalidate the ballot in the absence of evidence of intent to distinguish it.

9. SAME.—Ink blots and pencil marks upon a ballot which appear to have been accidental do not render the ballot invalid.

G. N. BROWN AND T. R. BROWN FOR APPELLANTS.

1. The duties of the canvassing board are judicial in their nature and therefore mandamus does not lie to control the action of the board.    (Secs. 37, 38, of article 3 of Election Law; Commonwealth v. Boone County Court, 82 Ky., 632; Lowe v. Phelps, 14 Bush, 642.)

2. If mandamus was the proper remedy the court should have said how the votes should be counted and have given the certificate of election to the candidate having the highest number of votes.

3. No ballot should be rejected unless it is "impossible to determine the voter's choice."    (Election Law, art. 3, sec. 26.)

4. The court erred in failing to count seven legal votes cast for George H. Mead.

THOMAS H. HINES ON SAME SIDE.

The law as it now is seeks only to ascertain the intention of the voter, expressly providing that "no ballot shall be rejected for any technical error which does not make it *impossible* to determine the voter's choice."

It can not be said that it is impossible to ascertain the intention of the voters from the ballots which appellants insist should be counted.    (Ky Sta., secs. 1482, 1471; Paine on Elections, secs. 430, 551; State, &c., v. Russell, 34 Neb., 117; Grant v. McCallum, 12 Canadian Law Journal, 113; People v. Hilliard, 29 Ill.; Clark v. McKenzie, 7 Bush, 530.)

WM. H. HOLT FOR APPELLEE.

1. The duties of the canvassing board were ministerial and therefore mandamus lies.    (Patton v. Coates, 41 Ark., 111; State v. Peacock, 15 Neb., 442; Lewis v. Commissioners, 16 Kan., 102; State v. Judge, 9 Ala., 338; Kesler v. Cameron, &c., 39 Ind., 488; McCrary on Elections, secs. 363-4; 6 Am. and Eng. Enc. of Law, 310; Clark v. McKenzie, 7 Bush, 523.)

An imperfect performance of their duty is equivalent to a refusal to perform it and the writ lies to compel a re-canvass. (State v. Judge, 7 Iowa, 399; State v. Secretary of State, 32 La. Ann. 579; Rice v. Judge, 7 Iowa, 186; Roberts v. Rives, 27 Ill., 247; Strong petitioner, &c., 20 Pick., 484; Moses on Mandamus, p. 90; Clark v. McKenzie, 7 Bush, 523; Fuller v. Hilliard, &c., 29 Ill.; Ellis v. Commissioners, 2 Gray, 370.)

Houston, County Judge, &c., v. Steele.

2. The writ lies against ministerial officers not only to compel them to act but to direct how and specifically what they shall do. (Wood on Mandamus, p. 25; Rice v. Judge, 7 Iowa, 186.)

3. While the board had nothing to do with the 31 uncounted votes, yet if they could be considered the appellee would still be entitled to the certificate.

The marking of ballots must always be done with *ink stencil*, and ballots marked in any other way can not be counted. (Steele v. Calhoun, 61 Miss., 556; 6 Am. and Eng. Enc. of Law, 349.)

If the ballot is so marked that it may be identified it should be rejected. (State v. McKinnon, 8 Oregon, 493; McCrary on Elections, sec. 403.)

ROLAND C. BURNS on same side.

1. The duties of the canvassing board are ministerial and therefore mandamus lies to control their action and to compel the giving of a certificate of election. (High's Extraordinary Remedies, secs. 60, 61; Bateman v. McGowan, 1 Met., 533; Trustees v. Kinner, 13 Bush, 334; 6 Am. and Eng. Enc. of Law, 310; Clark v. McKenzie, 7 Bush, 523; 38 Ohio St., 599; 6 Am. and Eng. Enc. of Law, 313; State v. Judge, 9 Ala., 338; State v. Judge, 13 Ala., 805; Kisler v. Cameron, 39 Ind., 488; State v. Co. Judge, 7 Iowa, 186; State v. Bailey, 7 Iowa, 390; Strong, petitioner, 20 Pick., 484; Burke v. Monroe County, 4 W. Va., 370; 20 Am. and Eng. Corp. Cases, 44.)

2. The ballot must properly designate the person voted for, and a mistake can not be cured by evidence. (5 Den. (N. Y.) 409; 33 Kansas, 202; 31 Kansas, 435.)

3. Rejected ballots can not be counted. (Hart v. Harvey, 32 Barb. (N. Y.) 55; Webster v. Byrnes, 34 Cal., 273.)

4. The prohibition of distinguishing marks in the election law is mandatory, and the use of any other mark than the cross invalidates the vote. (Montreal West Case, 2 Lower Can. Jur., 22; Dionne v. Gognon, 9 Quebec, 20; Monck Case, Hodgins El. cases, 725; North Vic. Case, *Idem*, 671; Commonwealth v. Woelper, 3 S. & R. (Pa.) 29; State v. McKinnon, 8 Oregon, 493; Perkins v. Caraway, 59 Miss., 222; 58 Miss., 502; 61 Miss., 556; 11 Weekly Law Bulletin, Ohio, 7.)

JUDGE HAZELRIGG delivered the opinion of the court.

At the November election, 1892, the appellants composed the canvassing board of elections for Boyd county, and on

the day provided by law the returns of the various precincts
at that election were presented to them for their official
action.   They found before them the stub-books of the va-
rious precincts, containing the proper official certificates
of the number of votes cast, and for whom, together with
four sealed envelopes from precincts 2, 3, 8 and 9, purport-
ing to contain "doubtful or questionable ballots," properly
endorsed by the respective precinct officers.   At that elec-
tion the appellee, Steele, and one Meade were rival candi-
dates for circuit court clerk, and on the face of the returns,
as shown by the stub-books alone, Steele had received 1,542
and Meade 1,541.   The board then proceeded to canvass
the doubtful ballots, counting 6 for Steele, 10 for Meade,
including 2 given him by the precinct officers, and, there-
fore, included in his vote of 1,541, and rejecting 15 others.
This elected Meade by 1 vote, and his certificate of election
was issued to him accordingly.   Thereupon Steele filed his
petition in equity in the Boyd Circuit Court against the
members of the board, in which he set out in substance the
facts stated above, and in which he questioned the right
of the board to canvass or consider the doubtful ballots.
He claimed his own election and right to the certificate, and
asked that the board, by mandamus, be compelled to meet
again, re-canvass the vote, and give to him the certificate of
election; and that the board be directed not to count for
Meade certain-named ballots, or any ballots unless without
distinguishing marks, and marked with the cross in the
way provided by law.

   After the disposition of some preliminary motions affect-
ing the notice for the mandamus, and an order overruling a
demurrer to the petition, an answer was filed, without ob-
jection to the form of the action, in which Meade was al-
leged to have in fact received the highest number of votes,

as shown by the returns, and was, therefore, entitled to the certificate. The details of the canvass of the returns were set out, and the fact admitted that the doubtful ballots had been canvassed as part of the returns.

Upon final hearing the court granted the writ, and directed the canvassers to meet at a time certain and proceed to canvass the returns of the election in question. They were further directed to count of the doubtful ballots two for Steele, known in the record as "S 1" and "S 2," and two for Meade, known as "M 1" and "M 2," and no others for either of the candidates. The court further adjudged that as Steele had received 1,544 votes and Meade 1,543 votes the former was entitled to a certificate of election, and the board was directed to issue it to him. From this judgment the members of the board have prosecuted this appeal.

It will be seen that the learned trial judge upholds the right of the board to open the sealed envelopes and canvass the doubtful ballots. If he is right in determining this to be its duty, an inspection of the ballots, the originals being before us, will readily show whether or not his award of the certificate was to the proper candidate. This inspection we will postpone until we have determined the more important question presented in the record of whether the canvassing board was authorized to canvass, as a part of the election returns, the doubtful or questioned ballots.

The law affecting the disposition of these ballots, and the duty of the precinct officers with respect thereto, is found in the Kentucky Statutes, as follows:

"§ 1482. When the polls are closed the officers of election shall, in the voting room, immediately count the votes, and certify the same as hereinafter provided; and no adjournment shall be had until the same is completed. When the result of the ballot is ascertained, it shall be immediately

announced by one of the judges in front of the voting room, and thereupon the judges shall, in the presence of the clerk, sheriff and the inspectors provided for in the preceding section, destroy the ballots voted, mutilated or spoiled, and the ballots remaining unvoted: *Provided,* That if there are any ballots cast and counted, or left uncounted, concerning the legality or regularity of which there is any doubt or difference of opinion in the minds of the judges of election, said ballots shall not be destroyed, but sealed up and returned to the clerk of the county court, with the returns of the election, for such judicial or other investigation as may be necessary, with a true statement as to whether they have or have not been counted, and, if counted, what part, and for whom.

"§ 1483. * * * When the foregoing requirements have been complied with, the judges shall deliver the stub-book containing the foregoing returns, together with the undestroyed ballots, inclosed in an envelope, to the sheriff of election before they separate."

"§ 1508. Within two days next after an election the sheriff shall deposit with the clerk of the county court the returns of the different precincts. On the next day the board shall meet in the clerk's office, between ten and twelve o'clock in the morning, open and canvass the returns of such election, and give triplicate or more written certificates of election over their signatures of those who have received the highest number of votes for any office," etc.

It will be noticed that nowhere in the law are the doubtful or questioned ballots to be separated from the stub-book containing the other returns of the election. They are to be sealed up and, with the stub-book, delivered to the sheriff. That officer must then deposit with the clerk of the county court "the returns of the different precincts." The

word "returns," as here used, must include the undestroyed
ballots, for, otherwise, there is no law directing the sheriff
what to do with them; and immediately following the clause
so using the word we find the direction to the canvassing
board "to open and canvass the returns of such election."

The "returns" deposited by the sheriff would, therefore,
seeem to be the "returns" to be canvassed by the board.
And if these, in the one instance—where the statute defines
the sheriff's duties—include the doubtful and questioned
ballots, they must be held to do so in the other—when the
same section of the statute defines the duties of the board.

While this conclusion would seem to be logical enough
when looking to the very language of the law, it may be
admitted to involve a somewhat narrow construction, if not
otherwise supported; and certainly it would not be in the
way of a different construction, if the duty of merely can-
vassing the returns, which is confessedly the whole duty of
the board, can not be held to embrace a revision or correc-
tion of the action of the precinct officers in counting or re-
jecting doubtful or questioned ballots.

It has been said, often, by this court, and at least once
since the adoption of the present election law, that the du-
ties of this board are purely ministerial (Clark v. McKenzie,
7 Bush, 523; Broaddus v. Mason, 95 Ky., 421), and
this fact is supposed to prevent the exercise, on the part of
this tribunal, of the revisory or correcting power in ques-
tion.  It is evident, however, that, even under the old law
controlling the canvassing board, when its duty was merely
to "compare the polls and ascertain the correctness of the
summing up of the votes" (section 2, article 5, chapter 33,
General Statutes), this power was exercised without ques-
tion.  The board overlooked and supervised the figures re-
turned before it, if mistakes were found; and in this way

it added to or subtracted from the official statement of votes returned by the precinct officers and issued certificates of election accordingly. It determined whether or not the returns were genuine, and, in doing this, was governed by legal principles.

It acted on the face of the returns, it is true; but so would it if held to have the power to canvass the undestroyed ballots returned by the sheriff as part of the election returns. It can hear no proof and send for no papers or persons. It acts on the face of the stub-book and the ballots, when returned as the law requires, and with the "true statement" demanded by the statute. Practically, owing to the voter's failure to mark the ballot precisely as the law requires, his intention may be left in doubt; but, theoretically, the duty of the board, in its disposition of the ballot, is simple enough. The statute is exact, showing just how the ballots are to be marked, and the act of looking at them and, from their physical condition, assorting them, counting those which, on their face, conform to the statute, and rejecting those which do not, involves no more discretion than do the acts of sheriffs and of other purely ministerial officers in the daily discharge of their duties. That the duty in question must be performed by the exercise of intelligence, sense and judgment is no reason for saying that the function of the board is a judicial one.

We do not find, therefore, that, from the nature of the acts required of the board, if it be held to possess the power to canvass the *whole* of the returns, we are to say it is no longer a ministerial but a judicial body.

We may notice here a provision of the statute which may be thought to militate somewhat against the right of the board to canvass the undestroyed ballots. When they are sealed up they are to be returned to the clerk of the county

court "for such judicial or other investigation as may be necessary." It is clear, however, that this provision does not, in terms, preclude the canvass, nor does it seem to do so by implication. They are to be preserved because their legality or regularity is questioned, and they are to constitute a part of the returns to be made by the proper officers, and without reference to whether they are canvassed or not by the county board. They may be the subject of judicial or other investigation, such as this case illustrates, or such as would be illustrated if the case were before a board of contest. The words "judicial or other investigation as may be necessary," do not appear to be exclusive of other uses to which the preserved ballots may be put; but, when returned and canvassed, they are still to be preserved for the uses designated.

From these various premises, we conclude, not only that there is nothing in the statute itself at all precluding the board from canvassing these undestroyed ballots, but that the statute itself, in its very letter, provides for such a canvass of them, as part of the "returns;" and, furthermore, looking at the intention of the law, made to provide an honest and fair election, we believe there are many reasons why such a construction should be adopted.

In the first place, and repeating somewhat, we have seen that these ballots are included in the term "returns" as used in the statute to be delivered by the sheriff to the proper office, and then to be canvassed by the board.

Secondly. They are the ballots of voters, cast, it may be, in such fashion as excite a "doubt or difference of opinion" in the mind of a precinct officer, but most likely not so as to make it "impossible to determine the voter's choice." If such choice can be determined from an inspection of the ballot, the candidate is entitled to have it counted before the

certificate of election—an important and valuable paper—is issued, and likewise to have it rejected if not a legal ballot.

Thirdly. It is apparent that these ballots ought to be opened and canvassed at the earliest possible moment allowed by law after the close of the polls. If they are to be returned and kept in the clerk's office for an indefinite length of time, with the fate of the election depending on their appearance when opened, after weeks of delay, before the contesting board, the "investigation" they are apt to have undergone in the meantime is not such as will likely promote an altogether fair count. The law makes no special provision for their safety during this period of delay; but if they are opened and canvassed at once with the other returns, and while responsibility for their safekeeping for this limited period is directly placed on the sheriff and clerk, the danger of their being tampered with is very greatly lessened. This opening and canvassing will be done publicly and in the presence of the parties immediately interested, if they desire it, and the condition of disputed ballots, if important, may be accurately noted.

In the fourth place, we have seen that these ballots are sealed up by the precinct officers in an envelope and delivered to the sheriff at the close of the polls. They are to be preserved by him in that condition until delivered to the county court clerk, and this officer is still under the same injunction. He is not authorized to open the envelope or allow any one else to do so; and, unless they are to be treated as part of the "returns of the election," and delivered to the canvassing board, the clerk must continue to preserve them in the condition in which he received them. The result would seem to be that no candidate or person, properly interested though he may be in using them as the basis of a proposed contest of the election, which is allowed

him by law, can inspect them for that purpose; and yet the law exacts of the contestant, within a limited time, a notice setting forth the precise grounds of his contest, and none other than those contained in his notice shall afterwards be heard.   (Section 1535, Kentucky Statutes.)

While the contestant may have other grounds not affected by these ballots, it is known that they, in fact, furnish the most fruitful source of contention; and in no other way than that by which the canvassing board may open and consider these returns can the contestant comply with the exactions of the law in giving his notice.  And this furnishes us strong reason to believe that such a canvass was intended by the statute.

We are of opinion, therefore, that the learned trial judge properly upheld the right of the board to canvass the whole of the returns, and that, as a body of ministerial officers, it was controllable by mandamus.

The only remaining question is, did the board perform its duty correctly and issue its certificate to Meade as the person receiving the highest number of votes?  If it did, Steele has no cause of complaint, and the judgment below, erroneously directing a re-canvass of the votes and the issual of a certificate of election to him, must be reversed. If, however, Steele received the highest number of votes, as determined by the inferior court, the judgment must be affirmed, leaving to that court the enforcement of the mandate requiring the canvassing board—whoever may now compose it—to re-canvass the vote, as directed in the judgment, and issue its certificate to Steele.

As already indicated, there were thirty-one ballots returned with the statement required by law, and of these an inspection discloses seven were not marked at all—the

voters apparently forgetting to stamp or mark the blanks anywhere or in any way.

The balance of them are claimed, with more or less earnestness, by the one or the other candidate. The provisions of the statute controlling the question at hand are as follows:

"§ 1471. * * * On receipt of his ballot the elector shall forthwith, and without leaving the room, retire alone to one of the voting booths, as provided, and shall prepare his ballot by marking in the appropriate square a cross-mark (X) immediately following the name of the candidate of his choice for such office to be filled, and in case of a question submitted to the vote of the people, by marking in the appropriate square a cross-mark (X) against the answer which he desires to give. Should any elector desire to vote for each and every candidate of one party, he shall make a cross-mark (X) in the large square embracing the device and preceding the title under which the candidates of said party are printed, and the vote shall then be counted for all the candidates under that title: *Provided, however*, That, if a cross-mark (X) be made in the large square including the device of such party, and a cross-mark be also marked in the square after the name of one or more candidates of a different party or parties, the vote shall be counted for the candidate so marked, and not for the candidate for the same office of the party so marked; but the vote shall be counted for the other candidates under such party name or designation. If the elector mark more names than there are persons to be elected to an office, or if, for any reason, it is impossible to determine the voter's choice for an office to be filled, his ballot shall not be counted for such office. No ballot shall be rejected for any technical error which does not make it impossible to determine the voter's choice. Nothing in this

law contained shall be so construed as to prevent a voter from voting for any qualified person other than those whose names are printed on the ballots for any office to be filled, by writing with black lead pencil, under the designation of the office, the name of such person and placing to the right of such name a (X) mark. All marking upon the ballots shall be made with black ink stencil. There shall be kept in each booth the necessary stencils and pencils, to be securely fastened by a string or cord of sufficient length to enable the voters to use the same."

"§ 1473. * * * If any elector spoil or deface a ballot by mistake, so that it can not be used, he may return it and receive in place thereof one other ballot; and the fact shall be noted by the clerk by writing the word 'spoiled' on the stub and spoiled ballot."

"§ 1569. * * * No voter shall place any mark on his ballot, or suffer or permit any other person to do so, by which it may be afterward identified as the one voted by him. * * "

"§ 1570. If any person shall induce, or attempt to induce, any elector to write, paste or otherwise place on his ballot the name of any person or any sign or device of any kind, as a distinguishing mark by which to indicate to any other person how such elector has voted, such person so offending shall be guilty of felony, and, on conviction, be imprisoned in the penitentiary not less than two nor more than five years. Any ballot having any of the distinguishing marks mentioned in this section shall not be counted for any candidate voted for at that election."

A portion of the ballot used, which, if extended to the right, would show the devices of the People's ticket and others, is here produced in order that the location of the marks, etc., may be better understood:

Houston, County Judge, &c., v. Steele.

| DEMOCRATIC TICKET. | REPUBLICAN TICKET. |
|---|---|
| **Electors for President and Vice-President.** | **Electors for President and Vice-President.** |
| W. R. KINNEY. | WILLIAM A. MORROW. |
| | |
| CLAUDE M. THOMAS. | L. J. CRAWFORD. |
| | |

Of the twenty-four ballots remaining, the following five should be counted for Steele: Ballots numbered "R 16" and "R 18," which are each marked with a black lead pencil cross (X), in the large square containing the eagle—the Republican device—and with no other marks. In State *ex rel.* Waggoner v. Russell, 34 Neb., 116, the provision requiring the marking to be done in ink was held to be directory only, and ballots, if in other respects regular, will, in the absence of fraud, be counted, although marked with a pencil. (See also Grant v. McCallum, 12 Can. Law J. (N. S.), 113.) Also ballot "S 1," which has the stencil cross-mark just outside and to the right of the square containing the eagle, but just above the letters "ET," in "Ticket." Also ballot "S 2,"

which has the cross under the Democratic device, but which has it also immediately across the top of Steele's small square in the Republican column. Also ballot "C spoiled," which is marked with a solid, irregular, black figure, evidently made with a stencil by twisting or turning it in the voter's hands, or perhaps when too much ink was on the stencil, by mashing or pressing it down very hard. The marking was not delicately done, but the intention of the voter is manifest.

Next we have three ballots, "R 6," "R 7," and "R 8," probably intended for the entire Republican ticket, and hence for Steele, but which could only be counted for "Morrow," the name of the first Republican presidential elector. They are each marked in the small square immediately to the right of Morrow's name and nowhere else. Ordinarily to say that a ballot shows it was probably intended for a certain purpose is sufficient to require it to be counted, because if probably so intended, it would not seem to be impossible to determine the voter's choice. But if the voter really intended to vote only for Morrow, there was no other way in which he might do so, and it is altogether probable that some voters in the State did so intend.

These eight are the only ballots which, under any possibility, could have been intended for Steele, and the five, held to be sufficiently regular, added to the number given him by the certificates of the precincts officers, make his total vote 1,547.

Of the remaining sixteen ballots the following eleven should be counted for Meade: Ballots "R 11" and "R 14," marked with black lead pencil cross-mark in large square containing Democratic device and in no other way. Ballot "R 9," marked same as last named save that the horizontal line of

the cross has two down strokes on it, thus ⧺ ; and in this connection we notice ballot "R 13," marked in the large square of the Democratic device with three cross-marks in pencil thus "X X X." The question as to these ballots is not whether the intent of the voter is sufficiently shown, for that is beyond dispute, but whether these marks are "distinguishing" marks, signs or devices within the meaning of the statute. Fortunately we are not without direct authority on this point. Under a similar statute the court, in Woodward v. Sarsons, L. R., 10 C. P., 33, cited in notes to Rutledge v. Crawford (91 Cal., 526), 13 L. R. A., 762, held that the "use of two or three crosses instead of one, or of a peculiar form of the cross-mark," will not invalidate the ballot without evidence of intent to distinguish it.

So in the Nebraska case, already cited, it is said: "It is not every mark, by means of which a ballot might subsequently be identified, which is a violation of the statute. The mark prohibited by law is such a one, whether letters, figures, or character, as shows an intention on the part of the voter to distinguish his particular ballot from others of its class, and not one that is common to and not distinguishable from others of a designated class. The fact that a number of ballots are, without any evidence of a fraudulent intention on the part of the voters, distinguishable from others cast at the same polling places, as, for instance, marked with a pencil or with ink of a different color, does not bring them within either the letter or spirit of the statute."

Ballot "M 1," marked with stencil cross near the bottom and to the right of the large square containing the Democratic device and just a little to the right of the letter "T" in "ticket," and no other marks.

Ballot "B," counted by precinct officers and marked in

same place as last ballot, "M 1," except the stencil failed to make the cross complete.

The same description may be given of the mark on ballot "R 1," except that the imperfectly made cross is lower down, and is opposite the words "Electors for President and Vice-President," under the words "Democratic Ticket." The mark is within the Democratic column, and just above the small square opposite the name of the first elector.

Ballot "M 2" is stamped properly in the large square containing the Democratic device, and also to the left and below the name of the Republican candidate for sheriff. There are some ordinary ink blots on this ballot and several pencil check marks (thus √) near the names of five of the candidates on the Democratic ticket, but none near the name of Meade and Steele. These blots and marks appear to have been accidental.

In Rutledge v. Crawford, cited above, it is said: "It is not doubted, as was argued here, that tickets may be marked as they were, for the purpose of distinguishing them from other ballots, and to be furnished only to a certain class of voters. But in the absence of any proof tending to show this, the presumption must be that such impression was the result of accident." And where a ballot "had upon its back a very small piece of red sealing wax, and another a small stain, as if made by a drop of oil or something of that nature," the court held that it was far more reasonable to suppose these marks were placed there accidentally than that they were intended to distinguish the ballots or impart knowledge of the person who voted them.

Ballot "R 15," marked with black lead pencil cross in large square containing the Republican device, but also in the same way in Meade's square. We have already indi-

cated that such pencil marks were sufficiently regular to be counted.

Ballot "A," counted by precinct officers, is marked with stencil cross just under the words "Democratic Ticket," and above the words "Electors for President and Vice-President."

Ballot "R 24" is marked with a red pencil cross in Meade's square, and in like manner for two other Democratic candidates, and has no other marks except some apparently accidental ink blots. The effect of the use of ink of different colors is disposed of in the Nebraska case cited, and we do not think the pencil mark, as made here, in the absence of proof showing a design to distinguish, invalidates the ballot.

Of these eleven votes, two of them were given Meade by the precinct officers, leaving nine to be added to those given him by the certificates of those officers, increasing his total vote to 1,550 votes, and giving him a majority of three over Steele. The remaining five ballots are marked with the usual stencil cross, toward the head of the Democratic column, but somewhat more irregularly than the ones considered. Their validity need not be determined.

This case has been considered on petition for rehearing by Steele, a former opinion having reversed the judgment for reasons not now appearing satisfactory to us. That opinion is withdrawn, and, as it has been demonstrated that Meade was entitled to the certificate of election issued to him by the canvassing board, the judgment below is reversed, with directions to dismiss the petition.

Rehearing denied.