39 P.(2d) 1027

## CHAVEZ v. HOCKENHULL, Governor, et al.

### No. 4079.

Supreme Court of New Mexico.

Dec. 31, 1934.

Dissenting Opinion Jan. 4, 1935.

Woodward, both of Albuquerque, for informant.

Frank H. Patton, Asst. Atty. Gen., Reed Holloman, of Santa Fé, George R. Craig, of Albuquerque, and O. O. Askren and J. D. Atwood, both of Roswell, for respondents.

SADLER, Justice.

The state canvassing board, composed of Governor A. W. Hockenhull, Chief Justice John C. Watson, and Secretary of State Marguerite P. Baca, engaged in their official duty of canvassing the returns from the general election held in New Mexico on November 6, 1934, were about to canvass the returns from the several precincts of San Miguel county. At such election Dennis Chavez and the present incumbent, Bronson M. Cutting, were rival candidates for a regular six-year term in the United States Senate.

Before the official canvass of the returns from San Miguel county had actually been made, but after announcement from the board of canvassers that they proposed to canvass the returns before them, the said Dennis Chavez as informant applied for, and was granted by this court, an alternative writ of mandamus commanding the respondents as the state board of canvassers to convene immediately upon service of the alternative writ and canvass all returns of the election from the several precincts and election districts of the state of New Mexico, excluding therefrom 66 named and described precincts in San Miguel county, and that said board issue a certificate of election in accordance with the re-

A. T. Hannett, of Albuquerque, J. O. Seth, of Santa Fé, and Fred Wilson and Hugh B.

sult thereby shown to the informant, Dennis Chavez, or show cause, etc.

The basis for the issuance of the alternative writ is the charge that the returns from the precincts and election districts named, all in San Miguel county, N. M., disclose that there were included in said returns 1,616 ballots cast by unregistered voters which the statutes of New Mexico forbid being counted or canvassed; that the inclusion of said illegal votes in the canvass of said returns would change the result of the election as between the informant and his opponent, the informant having received 74,498 votes and his opponent 75,759 votes; that it further appears from said returns that in seven precincts and election districts from said county where a large number of unregistered votes were cast the election officials failed, as required by law, to put opposite the name of each voter the number of his ballot, so that, in the event of a contest, there would be no way of determining which of the ballots were legal and which illegal, and that in two precincts only part of the ballot numbers appear; that in four other precincts and election districts the combined vote received by informant and his opponent exceeds the total number of votes actually cast in said precincts; that in certain other precincts and election districts, seven to be exact, no tally was made in the pollbooks as required by law, and there was nothing on the face of said pollbooks to indicate the markings of the ballots for the respective candidates other than a list of the names of the voters and a certification in the back of said pollbooks as to the result.

It is further set out in the alternative writ that it appears from the returns as a whole that there was a concerted effort to defeat the will of the voters by "stuffing" the ballot boxes in said precincts and election districts in said county with unregistered votes, with the purpose of defeating the will of the people, and that such purpose will be realized and carried out if said votes are canvassed by respondents and included in the count as between informant and his opponent.

The matter is before us upon respondents' return in the form of an answer. The answer raises certain legal exceptions which are to be treated as a demurrer. Briefly, the legal exceptions are as follows:

(1) That, although in form mandamus, the relief actually sought is injunctive, which this court has no original jurisdiction to afford.

(2) That respondents are compelled to canvass all election returns certified and transmitted to the secretary of state by the election officers of the various precincts and election districts, and have no power to exclude from their canvass any returns properly certified; their power being limited to compelling the correction by proper election officials of irregular or improperly certified returns.

(3) That respondents' duties are wholly ministerial, being without power to inquire into or determine the legality of any vote cast and included in the canvass made by the precinct election officers.

(4) That the returns which respondents are required to canvass consist solely of the

certificates of the officials of the various precinct and election districts certified and transmitted to the secretary of state by such officers, showing the number of votes cast for each candidate.

(5) That informant has an adequate remedy at law by way of contesting the election without jeopardizing the legal votes cast in said precincts and election districts.

(6) That it does not appear from the facts stated in the writ that the illegal ballots alleged to have been cast and which it is alleged cannot be identified are sufficient in number to change the result of the election.

Following the interposition of said legal exceptions, the answer contains certain general denials, some in the language of the charge, and pleads affirmatively that respondents have substantially complied with the provisions of 1929 Comp. § 41-356, in the performance of their duties. They further allege that the returns which they are required to canvass consist solely of the certificates of the precinct and district election officers which show the number of votes cast for the various candidates as required by 1929 Comp. § 41-102, but further state and allege that informant has demanded of respondents that they include in the returns canvassed by them the tally sheets and poll lists required to be prepared by said election officers, together with the certified copies of the registration lists of the various precincts and election districts, required by law to be transmitted to the secretary of state by the respective county clerks not later than fourteen days before the date of the election. This

demand, respondents admit, they have overruled "on the ground that the said tally sheets, poll lists and certified copies of registration lists are not a part of the returns from the various precincts and election districts which by law they are required to canvass."

When the informant charges 1,616 unregistered votes to be included in the returns, it is fair to say that he comprehends the returns as embracing the certified registration lists from the precincts in question on file in the office of the secretary of state. It is also a fair construction of the allegations of the writ to say that the charge of "stuffing" the ballot boxes with unregistered votes refers to the said 1,616 votes.

The genuineness of the returns before the board is not questioned except as participation of unregistered voters to the extent charged may raise a question of genuineness; that is to say, it is not averred that forged signatures of election officials are presented or that the returns do not come from the proper sources. Cf. Luce v. Mayhew, 13 Gray (Mass.) 83.

From the pleadings before us, it is to be taken as admitted that the returns come from proper sources bearing genuine signatures of the election officials actually officiating at said election. The charge is that said election officials from the various precincts involved permitted an aggregate of 1,616 illegal, because unregistered, persons to vote at said election; that the participation in said election of said 1,616 unregistered voters approximating 15 per cent. of the total vote

cast in said county is sufficient to disclose a conspiracy or combination of illegal voting which impeaches the returns and warrants a refusal to canvass.

It is also urged (although informant's position is not confined to this contention) that the registration lists are a part of the "returns" before said board, and hence that the "returns" themselves disclose the vice pointed to; but further that, whether a part of the returns or not, the duly certified registration lists are a part of the official records of the office of the secretary of state; that the matters charged have been called to the attention of the board, can be readily ascertained by mere reference to official records in the same office in which the canvass is proceeding without the necessity of formal proof, and that it is the duty of said board to notice such obvious facts, and refuse to canvass.

Thus we are brought immediately to a consideration of the power and authority of canvassing boards, particularly, the state canvassing board. The extent of the board's powers must be deduced largely from the statute defining those powers. Article 5, § 2, N. M. Const., provides: "The returns of every election for state officers shall be sealed up and transmitted to the secretary of state, who, with the governor and chief justice, shall constitute the state canvassing board which shall canvass and declare the result of the election. The person having the highest number of votes for any office, as shown by said returns, shall be declared duly elected. If two or more have an equal and the highest number of votes for the same office, one of them shall be chosen therefor by the legislature on joint ballot."

The statute, 1929 Comp. § 41-102, gives the following definition of the word "returns," to wit: "As used in this act, unless the context requires otherwise: * * * The word 'returns' shall be construed to mean the certificate of the judges and clerks of election or counting judges and clerks showing the number of ballots cast for each candidate or for and against each constitutional amendment or other question."

Section 41-356, with reference to state canvassing board, among other things, provides as follows:

"The state canvassing board shall meet in the state capitol on the fourth Monday after each general election and proceed to canvass and declare the result of the election for presidential electors, United States senator, representative in Congress, and state officers chosen by the electors of all the counties in the state and the returns of the election upon constitutional amendments, and other questions affecting the state at large from the returns certified and transmitted to the secretary of state by the election officers of the several precincts and election districts and issue proper certificates of election. * * *

"The returns and certificates sent to the secretary of state shall be considered to be public documents subject to inspection during office hours by candidates and by the chairman of the state central committee of each of the dominant political parties or his accredited representative, and the same may be

copied upon request of such candidates or chairman or any of them by photostatic process or otherwise. (L. '27, Ch. 41, § 356.)"

The duties of county canvassing boards are set forth in section 41-347 et seq.

■ Coming, then, to the first contention of counsel for informant that the certified copies of registration lists in the office of the secretary of state are a part of the "returns." They are filed there by virtue of the direction contained in section 41-229, reading as follows: "The county clerk shall, at least fourteen days before the date of election, prepare and certify the registration book marked 'Final' for each precinct and election district to be sent to the judges of election at the time he transmits the other election supplies. Such registration book shall contain all of the names and places of residence of all persons registered in the registration book marked 'Original' as finally corrected for each precinct and each election district. The county clerk shall also, at the same time, prepare and deliver or cause to be delivered, free of charge, a certified list of the names and places of residence contained in said registration book marked 'Final' for each election district and precinct to the secretary of state and to the county chairman of each of the dominant political parties in said county. (L. '27, Ch. 41, § 229.)"

It will be noted that the members of the state canvassing board are directed to canvass and declare the result "from the returns certified and transmitted to the secretary of state *by the election officers of the several precincts and election districts* and issue proper certificates of election." Section 41-356. The certified copy of final registration list referred to in section 41-229 is sent to the secretary of state, not by precinct election officials, but by the county clerk. It is not one of the papers mentioned in section 41-356 from which the state canvassers are directed to "canvass and declare the result." Indeed, the lists must be filed at least fourteen days before the date of election. We find nothing in the context anywhere dictating or persuasive that we should enlarge the statutory definition of "returns" as contained in the act to include such certified copies of registration lists.

If to be considered a part of the returns, in theory at least, it must have been for the purpose of a comparison of names in the pollbooks with those in the registration lists for all precincts in the state. This would be an almost impossible task, in view of the limited time intervening between date of the canvass and January 1st thereafter, when the newly elected officials assume office. Preservation of a true copy of such lists against loss or destruction, rendering it difficult to make fraudulent alterations or changes, and no doubt other sufficient reasons, furnish ample warrant for the statutory requirement of filing the certified lists with the secretary of state.

■ It is, of course, agreed by counsel on both sides that registration is absolutely essential to the right to vote. And our attention is called to section 41-209, which provides: "No person shall vote at any general election unless registered as herein provided;

and no ballot of any unregistered person shall be counted or canvassed."

How, inquire counsel, is this mandate to be enforced, if we deny the state convassing board the right to refuse to canvass such ballots? It seems obvious that this statute is not addressed to the state canvassing board, since it neither counts nor canvasses *ballots*. Its duty is to canvass *returns* as shown by section 41-356, quoted supra.

■ The certified registration lists not being a part of the returns, what was the duty of the canvassing board upon having their attention called to the situation disclosed by the record before us, which is admitted to be true for purposes of the decision upon the legal exceptions? Controlling principles force us to say that under such circumstances the state board had no discretion but to canvass the returns before them which, as we have held, do not include said registration lists. The text citations all agree with a unanimity of decision that, if the returns are genuine, the canvassers must canvass. McCrary on Elections (4th Ed.) § 261; 20 C. J. 200; 9 R. C. L. 1110; 10 Amer. & Eng. Encyc. of Law, 746; Bull v. Southwick, 2 N. M. 321; County Com'rs of Franklin County v. State, 24 Fla. 55, 3 So. 471, 12 Am. St. Rep. 183. Although granted that the canvassers have the power to pass upon the genuineness of the returns before them, beyond that their powers are purely ministerial. 20 C. J. 200–202.

■ If we should hold the state canvassing board possessed of the powers here claimed for it, the board would be exercising judicial functions without legislative or constitutional warrant. It can hardly be doubted that determination by such board of the question whether illegal or fraudulent votes have been cast, or have been cast in such numbers, as to warrant excluding such returns from the canvass, presents a judicial question.

Reliance is placed upon the case of State v. Stevens, 23 Kan. 456, 33 Am. Rep. 175, the opinion in which was written by Mr. Justice Brewer, later a distinguished member of the United States Supreme Court. Now, it must be admitted that was an extreme case. It involved a county seat election. The total vote cast was over 2,900; that eligible, 800. The county board refused to canvass. The Supreme Court of Kansas refused to compel them to perpetuate a fraud so monstrous. The vote cast was nearly 300 per cent. in excess of the qualified vote. Without questioning the justness of the decision nor its righteousness, the same court both before, Lewis v. Marshall County Com'rs, 16 Kan. 102, 22 Am. Rep. 275, and since, Brown v. Board of Com'rs, 38 Kan. 436, 17 P. 304, has repeatedly reaffirmed the ministerial character of the duties of canvassing boards and their want of power to cast out or even pass upon the legality of votes cast.

We do not wish to be understood as condoning or viewing with indifference the situation here confronting us, the truth of which the demurrer admits. If it be a fact, as the demurrer admits for purposes of a decision thereon, that 1,616 unregistered voters participated in this election in San Miguel county, we are indeed confronted with a disgraceful situation, one that merits prompt and

vigorous investigation and appropriate punishment for the guilty parties. Yet even strong facts do not warrant us in clothing the state canvassing board with powers not possessed under the law.

■ If we concede to the state canvassers the power to notice the registration list in the office of the secretary of state, a thing which by their answer they admit they have not done and assert a want of power to do, it must be to some end and purpose. Strictly, it may be suggested that what the canvassers would do should they take cognizance of the registration lists for these precincts is a question not before us, since admittedly they have not done so. But it is a legitimate inquiry upon the power to inspect to consider the purpose of inspecting. Obviously, the purpose would be to impeach returns otherwise regular; to go behind the returns themselves to prove illegal practices and voting. Decision after decision repudiates any such power. See text citations, supra, and supporting cases.

■ Let us assume that the board does consider the registration lists, not as a part of the returns, but as documents and records furnished the secretary of state in connection with the election, open as contended, to their inspection. They discover a showing that 1,616 unregistered votes were cast. Does this conclude the matter? Must they now pass judgment upon the illegality and fraudulent character of these votes upon such a showing, and either exclude the vote of the entire precinct, containing many admittedly legal votes, or refuse to do so and canvass them?

In the showing before them, there may be included some absolutely legal· votes, questioned because of misspelling of the name or other misdescription insufficient to invalidate them. Are all such matters to be foreclosed upon the mere exhibit to the board of the certified registration list? And, if not, who is to find the facts and decide the law? Surely not the canvassers, for they are a nonjudicial body without power to summon witnesses and hear testimony. Whatever other tribunal possesses the power to determine these questions, it seems plain to us that it is not the province of the state canvassing board to do so. This would be assuming a judicial function.

■ But a holding that the registration lists are not a part of the returns, nor may be looked to for the purpose of impeaching otherwise regular returns, does not conclude the issues. The return of the canvassers admits that informant demanded that they consider as a part of the returns the poll lists and tally sheets. They admit overruling the request holding to the view that the certificates and they alone constituted the "returns" to be canvassed by them.

In this we think they were correct when acting on such certificates for the ultimate purpose of determining the vote cast for each candidate in the particular precinct and declaring the result. But, for the purpose of discovering any "discrepancy, omission or error," and securing the correction thereof, in conformity with sections 41-357 and 41-358, we think not alone the certificate but the tally sheets and pollbooks as well are to be

considered as constituting the "face of the returns" which are transmitted to the secretary of state as required by law. For such purposes, and for such purposes only, the pollbooks and tally sheets are to be deemed a part of the returns.

While under the strict definition of returns as found in section 41-102 the poll lists and tally sheets would not be considered a part thereof, nevertheless the very statute which defines returns directs it is to have such meaning only in the event the context does not otherwise require. For the purposes above mentioned, we think the context does otherwise require.

By way of further illustrating, let us examine section 41-347 relating to county canvassers. They are directed to canvass the returns in a certain way. The very first direction is carefully to examine the pollbooks to see that the certificates are duly filled out and signed, "and whether any discrepancy, error or omission appears on the face of the returns." It seems fair to infer that in subsection 1 of this section, and in the first part of subsection 2 following, the word "returns" comprehends in meaning the tally sheets and pollbooks. It is not nearly so likely that discrepancies, errors, and omissions will appear from the mere certificate itself as from a comparison of the certificate with the tally sheets and pollbooks.

Again, in the last paragraph of section 41-356, the statute refers to the "returns and certificates" sent to the secretary of state which are to be considered public documents, etc. The statute itself thus differentiates at this point between "returns" and "certificates." Here the context suggests a larger meaning for the word "returns" than the strict statutory definition.

In another part of subsection 2 of section 41-347, it provides that, where a variance exists between the copy of the "returns" delivered to representatives of the political parties pursuant to section 41-342 and the one found in the back of the pollbook, the canvassers must immediately summon the proper election officials to secure a corrected return. Here it is quite obvious that the word "returns" means only the certificate.

But what is its meaning in the direction to the state board to canvass and declare the result "from the *returns* certified * * * to the secretary of state by the election officers of the several precincts," in section 41-356? Here we think it carries the strict statutory definition. Even though the canvassers may for purposes of discovering discrepancies, errors, omissions, etc., "on the face of the returns" and directing their correction, consider tally sheets and pollbooks a part of the "returns," still it must have been contemplated that these corrections, when made, should reflect themselves in a corrected certificate, and it is these corrected certificates as well as those requiring no correction which the statute contemplates should be "canvassed" for the purpose of declaring the result.

Although it may seem futile to seek statutory definitions of the word "returns" from decisions elsewhere, when we have a definition in our own act, nevertheless authorities

are not wanting from other jurisdictions persuasive of the correctness of our conclusion upon this question. See People v. Ruyle, 91 Ill. 525; Price v. Ashburn, 122 Md. 514, 521–524, 89 A. 410; Kelley v. State, 102 Ark. 651, 145 S. W. 556; Houston v. Steele, 98 Ky. 596, 34 S. W. 6, 8, 17 Ky. Law Rep. 1149; Slingerland v. Norton, 59 Minn. 351, 61 N. W. 322; State v. Kavanagh, 24 Neb. 506, 39 N. W. 431; State v. McFadden, 46 Neb. 668, 65 N. W. 800.

The conclusions we have reached render unnecessary in disposing of this case the consideration of other legal points raised. For the reasons given, the application to make the alternative writ permanent will be denied and the alternative writ discharged.

It is so ordered.

NUMA C. FRENGER and M. A. OTERO, JR., District Judges, concur.

BICKLEY and ZINN, Justices (dissenting).

We agree with the state canvassing board as to the definition of the word "returns."

Section 41-102, Comp. St. 1929, defines "returns" as follows: "The word 'returns' shall be construed to mean the certificate of the judges and clerks of election or counting judges and clerks showing the number of ballots cast for each candidate or for and against each constitutional amendment or other question."

It is suggested that this definition is not controlling, because the first sentence of the foregoing section dealing with definitions says, "as used in this act, unless the context requires otherwise," and that the context indicates that "returns" may be something different from the certificates of the judges and clerks of election mentioned in the statutory definition of returns. This suggestion proceeds principally from the claimed significance of the concluding paragraph of section 41-356, which declares: "The returns and certificates sent to the secretary of state shall be considered to be public documents subject to inspection during office hours by candidates and by the chairman of the state central committee of each of the dominant political parties or his accredited representative, and the same may be copied upon request of such candidates or chairmen or any of them by photostatic process or otherwise."

Hence it is argued that returns embrace something else besides certificates, and indicates a use of the word "returns" as contradistinguished from certificates. This suggestion and argument is interesting, but loses its force upon further examination of the statute. Section 41-350 provides: "When the county canvassing board shall have completed the canvass of the returns and ascertained the result, it shall issue election certificates to all county officers and to members of the legislature elected from such county only, and shall declare the result as to all questions affecting such county only, and shall immediately certify to the state canvassing board the number of votes cast for all other candidates and questions, respectively, and immediately deliver to the county chairman of each of the dominant political parties in the county a cer-

tificate showing the total number of votes cast for each candidate at such election."

The second paragraph of section 41-356 provides: "Said state canvassing board shall at said time and place also canvass and declare the result of the election for judicial district officers and members of the legislature chosen by the electors of more than one county, from the certificates transmitted to said board by the several county canvassing boards showing the number of votes received by each candidate and issue proper certificates of election."

It is apparent that this is one of the certificates from which the state canvassing board may canvass and declare the result of an election, but it is merely a different kind of certificate which emanates from an authority which is differently constituted from the authority which issues the certificates mentioned in the statutory definition of "returns," supra. So, after all, returns are limited to certificates.

It is as though the last paragraph of section 41-356 read: "The 'certificate' of the judges and clerks of election or counting judges and clerks showing the number of ballots cast for each candidate or for and against each constitutional amendment or other question," and "The certificates transmitted to said board (state canvassing board) by the several county canvassing boards showing the number of votes received by each candidate," shall be considered to be public documents subject to inspection, etc. See section 41-357 and section 41-358, which preserve

the distinction between the two kinds of certificates.

It is to be presumed that the Legislature, in enacting the statutory definition of returns, was not unfamiliar with the fact that there had been a conflict of opinions in the courts and among lawwriters as to what election papers were embraced within the word "returns," and it is to be further presumed that the Legislature intended that the canvassing boards should not be left in doubt as to the significance of the word "returns." This consideration lends force to the idea of conclusiveness of the statutory definition.

We are in accord with the views expressed by our associates that the canvassing board has power to test the genuineness and accuracy of the certificates as "returns" by looking to the poll lists and tally sheets for the purpose of discovering and causing to be corrected "any discrepancy, omission, or error." If these election papers, which in our view are not embraced within the word "returns," as defined by the Legislature, may be looked to for the purposes aforesaid, we are forced to the conclusion that the registration lists, which are public documents of no less dignity and not less informative than the poll lists and tally sheets, may also be looked to for the purpose of testing the integrity and correctness of the "returns." We entertain the same view as to all public documents pertaining to elections which are required by law to be filed with the secretary of state or the canvassing board.

We have stated the matter mildly when asserting that the registration lists are of no

less dignity and not less informative than the poll lists and tally sheets.

The fundamental importance of the registration lists in the scheme of holding elections under our system is easily demonstrated.

The Constitution, which is the direct expression of the will of the people, manifests a solicitude for the purity of elections and the protection of the elective franchise. Article 7, § 1, declares: "The legislature shall have the power to require the registration of the qualified electors as a requisite for, voting. * * * The legislature shall enact such laws as will secure the secrecy of the ballot, the purity of elections and guard against the abuse of elective franchise. Not more than two members of the board of registration and not more than two judges of election shall belong to the same political party at the time of their appointment."

It appears to us that this language of the Constitution makers stresses the importance of registration, and that it also stresses the importance of the registration boards being constituted upon a bipartisan basis, and that it is indicated that the boards of registration and the judges of election are all election officers. The Legislature seized upon the power thus reposed in them and enacted an elaborate election code, the reading of which at once presents the legislative view that the requirement of registration is of paramount importance in effectuating the constitutional admonition to provide for the purity of elections, and to guard against the abuse of the elective franchise it is provided that a copy of the registration lists, as finally made up, shall be filed with the secretary of state, who is a member of the state canvassing board, fourteen days before an on-coming election.

Abundant opportunity is provided for registration and for purging the lists and for corrections and amendments with the aid of the courts. But there comes a time fifteen days before the on-coming election when the lists are closed and become final, and, as required by law, are to be marked "Final" registration lists. One of such "final" lists is sent with the other election supplies to the judge of election in each precinct or voting district authorized to receive the same. It becomes then the most important working tool of the precinct election officers, for it is said in the statute that: "No person shall vote at any general election unless registered as herein provided; and no ballot of any unregistered person shall be counted or canvassed." Comp. St. 1929, § 41-209.

It is also provided that: "When an elector presents himself at the polls to vote one of the judges of election shall announce his name in an audible tone of voice and it shall be ascertained whether such elector is registered, and if so * * * one of the judges of election shall deliver to the elector an official ballot." Comp. St. 1929, § 41-312.

Upon the conclusion of the counting and tallying of the votes and certifying the same, the ballot box, pollbook, "and the 'Final' registration book shall be immediately returned to the county clerk, * * * and the other poll book or books shall be immediately placed in the mailing tube and mailed to the

secretary of state" (Comp. St. 1929, § 41-343); a copy of the "Final" registration book being already on file in the office of the secretary of state.

The provisions for registration require, not only that the names of the qualified voters shall be displayed therein, but the total number of qualified voters in the precinct or election district who have registered must be also stated. Another provision of the statute is that the judges of election, in making their return (certificates), shall state not only the number of votes which each candidate has received, but the total number who voted at the election. Comp. St. 1929, § 41-338. Another section sets forth the form of the certificate, and provides for a statement that "and that the number of electors who so voted is ————." Comp. St. 1929, § 41-319. We think the state canvassing board could properly refer to the registration lists to ascertain whether the total number of votes cast in a given precinct was in excess of the number certified by the registration board as being qualified to vote and for such other purposes as may enable the board to test the truth of the "returns."

Whether the discrepancy appearing in the case at bar might lead the canvassing board to the conclusion that the return was fraudulent and thereby impeached, is a question not now before us, because the state canvassing board has not pursued a canvass in the manner otherwise than looking to the returns as defined in the statute.

In the prevailing opinion, the majority comment upon the decision of Mr. Justice Brewer, later a distinguished member of the United States Supreme Court, in the case of State v. Stevens, 23 Kan. 456, 33 Am. Rep. 175, and say that, because in that case considered by the distinguished justice there were only 800 legal votes as against 2,900 votes cast, thereby that case was an extreme case. Percentage is not the criterion. Whether a fraud amounted to 300 per cent. or 15 per cent. cannot be determinative of the issue. Fraud of one-tenth of 1 per cent. may be sufficient to change the result of the election.

When the election officials who are charged with the solemn responsibility of effectuating the constitutional mandate to secure the secrecy of the ballot, the purity of the election, and guarding against the abuse of the elective franchise willfully permit 1616 illegal ballots to be placed in the ballot box, and thereafter count and canvass such ballots contrary to the express mandate of the law, this alone destroys the integrity of their official acts. If the election officials betray their trust in one instance, their certificate becomes valueless.

Section 574 of McCrary on Elections (4th Ed.) is illustrative of the idea we advance: "Fraud in the conduct of an election may be committed by one or more of the officers thereof, or by other persons. If committed by persons not officers, it may be either with or without the knowledge or connivance of such officers. There is a difference between a fraud committed by officers or with their knowledge and connivance, and a fraud committed by other persons, in this: the former is ordinarily fatal to the return, while the latter is not fatal, unless it appear that it has

changed or rendered doubtful the result. If an officer of the election is detected in a willful and deliberate fraud upon the ballot-box, the better opinion is that this will destroy the integrity of his official acts, even though the fraud discovered is not of itself sufficient to affect the result. The reason of this rule is that an officer who betrays his trust in one instance is shown to be capable of the infamy of defrauding the electors, and his certificate is, therefore, good for nothing. If, for example, an election officer, having charge of a ballot box prior to or during the canvass, is caught in the act of abstracting certain ballots and substituting others, although the number shown to have been abstracted be not sufficient to affect the result, yet no confidence can be placed in the contents of a ballot-box which has been in his custody. We repeat, therefore, the opinion expressed in the former chapter, that a willful and deliberate fraud on the part of such an officer being clearly proven should destroy all confidence in his official acts, irrespective of the question whether the fraud discovered is of itself sufficient to change the result. The party taking anything by an election conducted by such an officer must prove his vote by evidence other than the return."

After all, the determination of the result by the state canvassing board is not final as to the rights of the parties or the public, and the issuance and delivery of a certificate of election by the canvassing board merely determines who shall have the laboring oar in establishing the right to the office.

The suggestion in the last sentence of the quotation from McCrary, supra, confirms this view.

Without going into detail or attempting the citation of authority, it is our view that the state canvassing board may consult all of the election papers which the law requires to be filed in the office of the secretary of state, who is one of the members of the state canvassing board, for the purpose of determining whether or not the board will canvass what purports to be a true return, but which is challenged as being a false return.

We think that a board of such dignity as the state canvassing board may take notice of facts which are of common and universal knowledge, and at least of its own records pertaining to the subject-matter of elections. This may be so, although the board acts ordinarily in a ministerial or quasi judicial capacity. It would seem that the power to canvass returns would embrace the quasi judicial power of determining the integrity of the purported returns.

For instance, it is provided by law that elections shall be held at a certain time. If precinct election officers in their return (certificate) should recite the holding of an election upon a day other than that upon which an election could be held, and the certificate speaks the truth as to the day upon which it was held, we apprehend that the state canvassing board could ignore such returns. To do this they would have to resort to the Constitution or laws in order to determine the time when elections are to be lawfully held.

The law requires that certificates of nomination shall be made by the officers of the party conventions. If the nomination of J. A. Jones was made and certified to the secretary as candidate for auditor, and in some manner or other through a mistake of the printer, or a mistake of the officials, on a part of the ballots the name was placed thereon as J. A. Jonas, and the election officers certified that J. A. Jonas received a certain number of votes, we think the state canvassing board could consult the certificates of nominations on file in the office of the secretary of state to ascertain whether as a fact there was a J. A. Jonas who had been nominated for the office in question, and thus entitled to have his name placed upon the ballot. We apprehend that, if it were found that there was no J. A. Jonas nominated or certified, the state canvassing board would not assume to count votes, certified by the election officials as having been cast for Jonas, for Jones. It might result in such an uncertainty that the canvassing boad would have to disregard such returns.

The foregoing are presented merely as illustrations.

The state canvassing board is a tribunal set up by the people in their Constitution, charged with the duty to "canvass and declare the result of the election." There is no constitutional restriction upon the scope of their inquiry into the truth of the returns. To "canvass" means to "examine."

It is our opinion that the state board of canvassers, a tribunal established by the Constitution, not as individuals, but consisting of two of the highest officials in the executive branch of the government, and the Chief Justice of the Supreme Court, an official learned in the law, while acting in most instances in a ministerial capacity, yet is endowed with quasi judicial powers at least to the extent of determining the genuineness of the returns which it is required to canvass. It seems to us that a false return is no return at all. It seems to be conceded that, if the return (certificate) is irregular on its face, or the signatures thereto are forged, or those who purport to have executed it are without authority to do so, the state canvassing board would be authorized to refuse to recognize such purported returns because of their spurious character.

We do not believe that the state canvassing board is limited in its inquiry as to the genuineness of the returns to matters of mere form, but they can look to the substance, and if, without being required to determine a controverted fact, they may discover from election papers which apparently the law has placed within their reach and perhaps within the scope of papers on file with them that the certificate does not speak the truth, and is plainly false and fraudulent, the board could refuse to canvass such purported return.

To say, as the prevailing opinion apparently does, that the state canvassing board and the courts are "confronted with a disgraceful situation" with respect to the conduct of an election, and that they cannot do anything about it, even to the extent of looking at the registration books, the constitutional and legislative yardstick by which the right to vote,

right to receive votes, right to count votes, right to canvass votes, right to return votes, is a doctrine in which we cannot acquiesce.

We express no opinion as to what the state canvassing board ought to do if such examination showed the returns to be false, and therefore not returns at all, because the canvassing board never reached the point of forming an opinion on this subject. In their view, they were restricted to an examination of the returns as defined by the statute, viz., certificates of the precinct election officers. The prevailing opinion indicates that they may now look to pollbooks and tally sheets also. It seems too bad to say that they may not also examine the registration lists which are the foundation of the whole structure of elections.

It is to be regretted that record evidence of a situation admittedly so flagrant and disgraceful as to arouse the indignation of the authors of the prevailing opinion to the extent of suggestion of criminal prosecution of the guilty parties is withheld from the canvassing board, so that we may not know whether such evidence would register with its quasi judicial conscience sufficiently to impeach the returns, or at all.

We cannot concur in the result because the pronouncement in the prevailing opinion that the canvassing board shall examine the poll lists and tally sheets, in our opinion, requires that the writ be made absolute to the extent of commanding the board to include the poll lists and tally sheets in the canvass of the returns as contended for by the informant.